# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

GATEWAY CLIPPERS HOLDINGS LLC,  )
GATEWAY CLIPPERS HOLDINGS LLC II, )
and GATEWAY CLIPPERS HOLDINGS  )
LLC III            )
               )
  Plaintiff,         )
               )  Case No.:
v.              )
               )
MAIN STREET AMERICA PROTECTION  )
INSURANCE COMPANY,      )
and             )
AMERICAN FAMILY INSURANCE   )
MUTUAL HOLDING COMPANY    )
D/B/A THE MAIN STREET AMERICA  )
GROUP,           )
               )
               )  JURY TRIAL DEMANDED
  Defendant.       )

## **PLAINTIFF'S COMPLAINT**

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................ 1

II.  THE PARTIES.................................................................................................... 6

III. JURISDICTION AND VENUE .......................................................................... 9

IV. FACTUAL ALLEGATIONS .............................................................................. 9

    A.    The Global COVID-19 Pandemic ................................................... 9

    B.    Steps Taken by Authorities T\to Control The Pandemic ............................. 12

    C.    The Damaging Impact of the Covid-19 Pandemic on Plaintiff.................... 13

    D.    Plaintiff's Business Insurance Policies with Defendants ......................... 15

    E.    Defendants' Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them ................................. 22

V.   JURY DEMAND ............................................................................................... 31

COUNT I: BUSINESS INCOME BREACH OF CONTRACT.................................... 31

COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
    DEALING APPLICABLE TO BUSINESS INCOME ............................. 32

COUNT III: DECLARATORY RELIEF ................................................................. 33

COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT.................................... 34

COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
    DEALING.......................................................................................... 35

COUNT VI: DECLARATORY RELIEF ................................................................. 36

PRAYER FOR RELIEF ........................................................................................ 40

ii

PLAINTIFFS GATEWAY CLIPPERS HOLDINGS, GATEWAY CLIPPERS HOLDINGS II, and GATEWAY CLIPPERS HOLDINGS III bring this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against MAIN STREET AMERICA PROTECTION INSURANCE COMPANY and AMERICAN FAMILY INSURANCE MUTUAL HOLDING COMPANY D/B/A THE MAIN STREET AMERICA GROUP demanding a trial by jury. Plaintiff makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Gateway Clippers, which are based on personal knowledge.

## I.   NATURE OF THE ACTION

1.   Gateway Clippers Holdings LLC, Gateway Clippers Holdings LLC II and Gateway Clippers Holdings III (collectively "Gateway Clippers" or "Plaintiff") own and operate 54 franchised Great Clips hair salons in Florida. To provide protection in the event of a catastrophic event beyond its control, Gateway Clippers purchased a business insurance policy from Defendant Main Street America Protection Insurance Company ("Main Street") and Defendant American Family Insurance Mutual Holding Company d/b/a The Main Street America Group ("American Family") (collectively Defendants). That policy promises to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to its property. This coverage, commonly known as "business interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

2.   Insurance is a way to manage risk, providing protection from financial loss. It is especially appropriate – indeed, vital – for protection against losses that, while unlikely, would be financially devastating if they occur. To protect itself from just such a disaster, Gateway

1

Clippers purchased business insurance, including business interruption coverage, from Defendants for the year February 1, 2020 to February 1, 2021.

3.  Main Street claims to "offer the coverages needed in today's dynamic marketplace to protect what's important to you: your livelihood"; that includes protection for hair salons:[1]



4.  To that end, Main Street tells prospective insureds that it protects loss of income and extra expenses resulting from an insured's loss:[2]

---

[1] https://www.msagroup.com/business/business-owners (accessed 10/4/2020).
[2] https://www.msagroup.com/business/business-owners (accessed 10/4/2020).



5.   American Family tells businesses that they need business insurance "because the reality is that without business insurance, your company's assets, and all of your hard work, can be lost if something unexpected should happen"[3]:



---

[3] https://amfam.com/insurance/business/coverages (accessed 10/15/2020).

6.   Then in March 2020, something unexpected happened, a disaster that was the worst health crisis to hit the United States, and indeed the world, in over a century, a worldwide pandemic of a disease called COVID-19. It caused massive illness and death.

7.   As a result of the pandemic and to protect against its spread, on March 16, 2020, the White House advised all Americans: "Do not go to work. Do not go to school."[4]

8.   Governor DeSantis followed on April 1, ordering all persons in Florida to stay at home except for essential services. Services provided by hair salons were not deemed essential.[5]

9.   Counties in Florida, including counties where Plaintiff's hair salons are located, issued similar orders even sooner.

10. As a result of the risks of staying open during the COVID pandemic, as well as the government orders, Gateway Clippers closed all of its Florida salons between March 20 and 22 and kept them closed for nearly two months. Even afterward, the need to socially distance has caused Gateway Clippers to be unable to serve its accustomed number of customers and therefore suffer continued losses. Plaintiff has also had to incur extra expenses for items necessary to keep the salons open, such as plexiglass dividers, masks and extra cleaning supplies.

11. However, Defendant refuses to comply with its obligation to cover Gateway Clipper's business income losses and covered expenses.

12. As shown herein, in response to Plaintiff's claim of losses caused by the COVID-19 pandemic, Defendant first tried to give Gateway Clippers the runaround, requiring that it supply a vast amount of irrelevant information or information that Defendant already knew before it would even say whether it would cover the losses. The information that Defendant demanded

---

[4] https://www.reuters.com/article/health-coronavirus-trump-guidelines-idUKL1N2B95Q1 (accessed 10/26/2020).
[5] Executive Orders No. 20-21 and 20-92, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-91-compressed.pdf and https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-92.pdf (both accessed 10/26/2020),

included financial statements going back many years (some of which is relevant for the amount of the loss but not for whether the loss is covered), a list of any *other* locations where Gateway does business, and even the names of employees who have contracted the disease.

13. Gateway asked Main Street to limit the questions to matters that it did not already know and that were relevant to the question of coverage. Main Street refused.

14. Ultimately, Defendant denied the claim for invalid reasons that, as shown herein, further demonstrate its bad faith. These included the following:

15. Defendant blatantly misinterpreted the Policy's Business Income coverage as requiring "physical loss or damage to the property." The Policy covers "physical loss *of* or damage to property, a difference that is critical because Plaintiff suffered a "loss of" its property when the pandemic rendered it unable to use its property as a hair salon.

16. Defendant failed to investigate governmental orders that led to the closure of Plaintiff's losses even though these losses are publicly available.

17. One of the grounds on which Defendant based its denial was the Policy's Virus Exclusion. However, it based that denial on an astounding misapprehension that COVID-19 is a virus rather than a disease caused by a virus.

18. The Virus Exclusion excludes from coverage losses that are directly caused by a ***virus*** where there is no other cause or event that contributes concurrently or in any sequence to the loss. Plaintiff's claim had asserted that its losses were caused by the COVID-19 pandemic, not the virus.

19. Any causal relationship between the virus and Plaintiff's losses is indirect (the virus caused COVID-19, which resulted in the pandemic, which caused Plaintiff to close its salons) and occurred in addition to other causes, namely the COVID-19 disease, the pandemic and

government closure orders. By misinterpreting COVID-19 as a virus, Defendant erroneously found a direct causal relationship between COVID-19 and Plaintiff's losses in the absence of other causes.

20. Gateway has therefore been forced to bring this lawsuit to obtain the coverage for which it obtained its Policy.

## II.  THE PARTIES

21. Gateway Clippers Holdings LLC, Gateway Clippers Holdings LLC II and Gateway Clippers Holdings III are Missouri Limited Liability Corporations with their headquarters 165 N. Meramec Ave., Suite 500, St. Louis, MO 63105at 165 N. Meramec Ave., Suite 500, St. Louis, MO 63105, where management decisions are made. Together, they owned and operated 54 franchised Great Clips hair salons in Florida at the time of the COVID-19 pandemic. They purchased a common policy, Policy Number: BPP1387S ("the Policy"), from Defendants, with a policy period of February 28, 2020, through February 28, 2021. (Ex. A at 11.)

22. Main Street America Protection Insurance Company ("Main Street") is a corporation incorporated in Florida with its headquarters at 46-1 Toughton Road East, Suite 3400, Jacksonville, FL 32246.

23. Main Street is part of Main Street America Group Mutual Holdings, Inc., a corporation that was also a party to Plaintiff's Policy, as can be seen from these screenshots from the Policy (Ex. A at 6, 10, 255):

*Important Information for Policyholders*

The Main Street America Group would like to thank you for your business. If you have any questions regarding your insurance policy, please contact your independent agent.

## Notice Of Change In Policy Terms -
## Electronic Data And Computers On Premises

The Main Street America Group is pleased to renew your Businessowners policy with $35,000 of automatic coverage for your computers and the electronic data associated with them. This coverage is not subject to an additional premium charge. It is incorporated into the language of the Businessowners Coverage Form – Section I – Property (form BPM P 1FL).

**ADDITIONAL INFORMATION**
If you would like to receive a copy of our privacy policy please contact us as follows:

Main Street America Group
ATT: Privacy Compliance Coordinator
55 West Street
Keene, NH 03431

24. The Main Street America Group claims to take care of its customers "better than anyone else":[6]

---

[6] https://www.msagroup.com/ (accessed 10/26/2020).



25. In or about October 2018, Main Street America Group Holdings, Inc. was merged with and into Defendant American Family Insurance Mutual Holdings Company. Pursuant to that merger, the separate existence of Main Street America Group Holdings, Inc., ceased. The surviving corporation following the merger was American Family Insurance Mutual Holding Company.[7]

26. American Family Insurance Mutual Holding Company is a Wisconsin corporation with its principal place of business in Madison, Wisconsin. It ranks No. 306 on the Fortune 500 list.[8] In 2019, it reported assets of $31.1 billion, members' equity of $9. 8 billion and revenue of $12.2 billion.[9]

---

[7]http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2018%5C1101%5C20260668.Tif&documentNumber=P05000145149 (accessed 10/26/2020).
[8] available through a link at https://www.amfam.com/about/financial-strength (accessed 10/26/2016).
[9] *Id.*

## III.JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(1) because the matter in controversy exceeds $75,000, exclusive of interests and costs and there is complete diversity between the parties.

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district.

29. The facts alleged herein show that the Court has specific personal jurisdiction over Defendants

## IV.FACTUAL ALLEGATIONS

### A.  The Global COVID-19 Pandemic

30. According to the World Health Organization ("WHO"), COVID-19 is an infectious disease for which there are no vaccines or treatments.[10] It spreads easily from person-to-person.[11]

31. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent, a virus known as coronavirus or SARS-CoV-2, fly into the air from the person's nose or mouth and can thereby infect others. This can occur even if the person is asymptomatic.[12] As WebMD states, "Some people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[13]

32. Thus, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

---

[10] https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 10/26/2020).
[11] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 10/26/2020).
[12] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 10/26/2020).
[13] *Id.*

33. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[14]

34. The coronavirus can also infect people who touch surfaces, such as countertops, furniture, doorknobs and other surfaces in a facility like Plaintiff's if it contains the virus. It can live on plastic and stainless steel for up to three days.[15]

35. According to the Centers for Disease Control, COVID-19 can cause mild to severe symptoms, such as cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat and loss of taste or smell.[16]

36. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[17] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[18] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019." [19]

37. After it was discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[20]

38. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[21] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[22]

---

[14] *Id.*
[15] *Id.*
[16] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (accessed 10/26/2020).
[17] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 10/26/2020).
[18] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 10/26/2020).
[19] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 10/26/2020).
[20] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 10/26/2020).
[21] https://www.merriam-webster.com/dictionary/pandemic (accessed 10/26/2020).
[22] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 10/26/2020).

39. At the point that WHO called COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[23]

40. According to the COVID Tracking Project, by that same date, March 11, 2,064 patients had tested positive (confirmed plus probable) in the United States, and 43 patients had died of the disease (confirmed plus probable). From that date on, the number of cases and deaths increased exponentially. By March 17, 2020, less than a week later, the number of cases nationwide had increased approximately 5 times to 10,358, and the number of deaths had increased by approximately three times to 120.[24]

41. By the time Governor De Santis issued its "Stay at Home" Order on April 1, 2020, positive tests nationwide had increased *another 22 times* to 224,086 and deaths another *44 times* to 5,324.[25]

42. As of October 16, 2020, according to the *New York Times*, there were more than 8 million COVID-19 cases in the United States, with 217,000 deaths.[26] That was more than any other country in the world and the 11th highest on a per capita basis in both metrics.[27]

43. Florida has been particularly hard hit. As of mid-October according to the New York Times, it was the fifth-ranked state in cases per 100,000 population. Here were the top ten:[28]

---

[23] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 10/26/2020).
[24] https://covidtracking.com/data/us-daily (accessed 10/26/2020).
[25] https://covidtracking.com/data/national (accessed 10/15/2020).
[26] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 10/16/2020).
[27] *Id.*
[28] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (accessed 10/15/20200.

| | TOTAL CASES | ▼ PER 100,000 | CASES IN LAST 7 DAYS | PER 100,000 | WEEKLY CASES PER CAPITA FEWER — MORE |
|---|---|---|---|---|---|
| + North Dakota MAP » | 29,658 | 3,892 | 4,091 | 537 | |
| + Louisiana MAP » | 176,209 | 3,790 | 3,584 | 77 | |
| + Mississippi MAP » | 108,139 | 3,634 | 4,576 | 154 | |
| + South Dakota MAP » | 31,012 | 3,506 | 4,309 | 487 | |
| + Florida MAP » | 744,980 | 3,469 | 18,925 | 88 | |
| + Alabama MAP » | 169,162 | 3,450 | 6,559 | 134 | |
| + Iowa MAP » | 103,222 | 3,272 | 7,700 | 244 | |
| + Tennessee MAP » | 217,230 | 3,181 | 12,854 | 188 | |
| + Arkansas MAP » | 95,246 | 3,156 | 6,366 | 211 | |
| + Arizona MAP » | 228,748 | 3,143 | 5,102 | 70 | |

44. Also in mid-October Florida ranked 11th among the states in COVID-19 deaths per 100,000 and sixth in deaths per 100,000 in the past week[29]:



**Cases and deaths by state and county**
This table is sorted by places with the most cases per 100,000 residents in the last seven days. Charts are colored to reveal when outbreaks emerged.

| Cases | **Deaths** | Search counties | | | |
|---|---|---|---|---|---|
| | TOTAL DEATHS | PER 100,000 | DEATHS IN LAST 7 DAYS | ▼ PER 100,000 | WEEKLY CASES PER CAPITA FEWER — MORE |
| + North Dakota MAP » | 375 | 49 | 62 | 8.1 | |
| + Arkansas MAP » | 1,634 | 54 | 152 | 5.0 | |
| + Missouri MAP » | 2,598 | 42 | 264 | 4.3 | |
| + Kansas MAP » | 838 | 29 | 115 | 3.9 | |
| + South Dakota MAP » | 304 | 34 | 33 | 3.7 | |
| + Florida MAP » | 15,735 | 73 | 691 | 3.2 | |

---

[29] *Id.*

12

**B. Steps Taken by Authorities to Control the Pandemic**

45. On March 13, 2020, the White House issued a proclamation declaring "that the COVID-19 outbreak in the United States constitutes a national emergency"; it specified that the emergency had actually begun March 1, 2020.[30]

46. As a result of the pandemic and to protect against its spread, on March 16, 2020, the White House advised all Americans: "Do not go to work. Do not go to school."[31]

47. Governor DeSantis followed on April 1, ordering all persons in Florida to stay at home except for essential services. Services provided by hair salons were not deemed essential.[32]

48. Many counties in Florida acted earlier.

49. For example, on March 24, 2020, Orange County, where Gateway Clippers had 13 salons, issued an Executive Order requiring all non-essential businesses to close. Hair salons were not regarded as essential.[33] On March 26, 2020, Orange County issued an order clarifying the March 24, 2020, Executive Order as to non-essential businesses, but still requiring hair salons to close.[34]

50. On March 19, Hillsborough County, where ten of Gateway Clippers' salons are located, prohibited gatherings of 10 or more people in a single room except for venues providing essential goods or services such as medical facilities and grocery stores. Hair salons were not deemed essential.[35] On March 26, 2020, Hillsborough County issued a "Safer at Home" order

---

[30] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (accessed 10/26/2020).

[31] https://www.reuters.com/article/health-coronavirus-trump-guidelines-idUKL1N2B95Q1 (accessed 10/26/2020).

[32] Executive Orders No. 20-21 and 20-92, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-91-compressed.pdf and https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-92.pdf (both accessed 10/26/2020),

[33] Executive Order 20-04, available at https://www.orangecountyfl.net/Portals/0/Library/Emergency-Safety/docs/coronavirus/Emergency%20Executive%20Order%20No.%202020-04%20-%2003-24-20.pdf (accessed 10/26/2020).

[34] Executive Order 20-05, available at https://www.orangecountyfl.net/portals/0/library/Emergency-Safety/docs/coronavirus/Orange%20County%20Executive%20Order%202020-05.pdf (accessed 10/26/2020).

[35] https://www.hillsboroughcounty.org/library/hillsborough/media-center/documents/administrator/administrative-orders/ao3192020.pdf (accessed 10/26/2020).

that, among other things, required businesses to close if their employees could not maintain a 6-foot physical distance from customers.[36] This made it impossible for Gateway Clippers' salons in Hillsborough to stay open because hair cutters and hair stylists cannot maintain a 6-foot distance from customers.

51. Similarly, Pinellas County, where Gateway Clippers had six salons, issued an order on March 25, 2020, that required all individuals in the county to maintain a distance of 6 feet from other persons and required hair salons to close because they were not among those allowed to stay open.[37]

52. Other Florida counties where Gateway Clippers has salons took similar steps.

**C. The Damaging Impact of the COVID-19 Pandemic on Plaintiff.**

53. As a result of the risks of staying open during the COVID-19 pandemic, as well as government shut-down orders, Plaintiff closed its Florida salons for up to two months beginning in the second half of March 2020. It closed three of its Tampa-area salons on March 20, 2020, and the remaining Florida salons on March 22, 2020.

54. Plaintiff re-opened all 31 of its Orlando-area salons on May 11, 2020, and its remaining salons at various dates from May 13-22, 2020. Even after re-opening, Plaintiff suffered business losses due to the requirement for social distancing, which limited the number of patrons in could handle at one time.

55. In addition, after re-opening, Plaintiff has had Extra Expenses because of the need to purchase such items as Plexiglass dividers, masks and cleaning supplies.

---

[36] https://www.hillsboroughcounty.org/en/media-center/press-releases/2020/03/27/hillsborough-county-emergency-policy-group-approves-safer-at-home-order (accessed 10/26/20).
[37] https://www.pinellascounty.org/emergency/PDF/covid19/res20-20.pdf (accessed 10/26/2020)

**D.  Plaintiff's Business Insurance Policies with Defendant**

56. In exchange for premiums paid by Plaintiff to Defendant, Plaintiff obtained a

Businessowners Policy, Policy BPP1387S, covering a Policy Period from February 28, 2020 to

February 28, 2021 ("The Policy"). *See* Ex. A. at 11 (all page numbers in citations to this exhibit

refer to the page of the pdf, including the cover page).

57. The Policy contains a Businessowners coverage form, Form BPM P 1 FL 03 19 (Ex. A at

161 ff.), which includes coverage for Business Income and Extra Expense. The provision for that

coverage states:

> We will pay for the actual loss of Business Income you sustain due to the
> necessary "suspension" of your "operations" during the "period of restoration".
> The "suspension" must be caused by *direct physical loss of* or damage to property
> at the described premises. The loss or damage must be caused by or result from a
> Covered Cause of Loss.

Ex. A at 166 (emphasis added).

58. The described premises are Gateway's Florida salons. Ex. A at 13-68.

59. Although some terms in the policy are defined, Defendants chose not to define "direct

physical loss of or damage to property" in the coverage for loss of Business Income. Thus, those

words must be given their plain and ordinary meaning, consistent with the expectations of the

policyholder.

60. In the phrase "direct physical loss of or damage to property," "loss" is used as an

alternative to "damage." Thus, there is coverage for both "loss" *and* "damage."

61. "Loss of property" can be reasonably read as being deprived of the use of property, while

"damage" can refer to a reduction in a property's functionality.

62. Using a grammatical reading of the phrase "direct physical loss of or damage to

property," the words "direct" and "physical" can be reasonably construed as modifying only the

word "loss" and not "damage." If Main Street had intended "direct" and "physical" to modify

15

"damage," it should have and would have said "direct physical loss or direct physical damage." In fact, there are commercial insurance policies that say just that, "direct physical loss or direct physical damage." To the extent that language in this policy is ambiguous, it must be construed against Defendant. Thus, while "loss" must be direct and physical, "damage" need not be.

63. The COVID-19 pandemic caused a direct physical loss of Gateway's property at the described premises by directly denying Plaintiff the ability to physically access and use the property in the normal fashion in its business; it is therefore a covered loss.

64. Because "damage" need not be "direct" or "physical" to be covered, it can be indirect and non-physical – *i.e.*, intangible. Plaintiff suffered such intangible damage – a reduction in the property's functionality – as a result of the COVID-19 pandemic.

65. The Policy defines Business Income as the:

> (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

> (ii) Continuing normal operating expenses incurred, including payroll.

Ex. A at 166.

66. The Policy also covers Extended Business Income for losses that occur after the property is restored, as follows:

> (a) If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

> > (i) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and 'operations' are resumed; and

> > (ii) Ends on the earlier of:

i The date you could restore your "operations", with reasonable speed, to
the level which would generate the business income amount that would
have existed if no direct physical loss or damage had occurred; or

ii 60 consecutive days after the date determined in Paragraph (a)(1) above,
unless a greater number of consecutive days is shown in the Declarations.

However, Extended Business Income does not apply to loss of Business Income
incurred as a result of unfavorable business conditions caused by the impact of the
Covered Cause of Loss in the area where the described premises are located.

(b) Loss of Business Income must be caused by direct physical loss or damage at
the described premises caused by or resulting from any Covered Cause of Loss.

Ex. A at 166.

67. "Suspension" means "[t]he partial slowdown or complete cessation of your business

activities …." Ex. A at 194. That applies to Plaintiff's Business Income losses because, as a

result of the COVID-19 pandemic, its business activities partially slowed down or ceased.

68. The Policy defines "[o]perations" as "[y]our business activities occurring at the described

premises …." Ex. A at 193.

69. For business income coverage, "period of restoration" starts "72 hours after the time of

direct physical loss or damage …." Ex. A at 193 and 13-68.

70. The Policy also covers "the necessary Extra Expense you incur during the 'period of

restoration' that you would not have incurred if there had been no direct physical loss or damage

to property at the described premises. The loss or damage must be caused by or result from a

Covered Cause of Loss." Ex. A at 167.

71. Extra Expense is defined, in pertinent part, as "expense incurred: (i) To avoid or

minimize the 'suspension' of business and to continue 'operations': 1. At the described premises

…." Ex. A at 167 (paragraphing omitted).

72. The Businessowners Coverage Form contains an additional coverage called, "Civil

Authority." Ex. A 168. That provision states:

17

When the Declarations show you have coverage for Business Income and Extra Expense, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin immediately after the time of that action and will apply for a period of up to thirty consecutive days after coverage begins.

73. Plaintiff has coverage under that provision because, under the governmental orders described above, access was prohibited to Plaintiff's premises due to direct physical loss of or damage to property at other premises. That loss and damage at other premises was due to contamination with the coronavirus.

74. As noted above, the Business Income and Extra Expense provisions provide that "loss or damage must be caused by or result from a Covered Cause of Loss." Ex. A at 166, 167. Because the phrase "Covered Cause of Loss" is not in quote marks, it is not a specially defined term.

75. The Policy provides that "Covered Causes of Loss" are "[r]isks of direct physical loss unless the loss is: a. Excluded in Paragraph B. Exclusions in Section I; or Limited in Paragraph A. 4. Limitations in Section I." – Special Form. Ex. A at 162 (paragraphing omitted).

76. None of the referenced Exclusions or Limitations apply to Plaintiff's losses.

77. One of the Exclusions is for "[t]he enforcement of any ordinance or law" (a) [r]egulating the construction, use or repair of any property …." Ex. A at 181 (Paragraphing omitted).

78. That exclusion does not apply to Plaintiff's losses for the following reasons:

79. *First*, the government closure orders were discretionary measures *authorized* by law but they were not the enforcement of ordinances or laws. There is no ordinance or law that required that Plaintiff suspend any of its operations during this pandemic.

80. Second, it was the pandemic that was the cause of the loss. The government orders did not cause or increase that loss. *See Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 352–53 (8th Cir. 1986).

81. Furthermore, Plaintiff closed its salons before it was ordered to by government authorities.

82. The Policy also contains a separate Endorsement titled, "Florida – Exclusion of Loss Due to Virus or Bacteria" (Ex. A at 153), which states:

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

83. That exclusion does not apply to Plaintiff's loss because that loss was not caused by a virus. There is no evidence that the virus has ever been in Plaintiff's premises. Plaintiff's loss was caused by a pandemic and the precautionary measures taken by federal, state and local officials to prevent its spread.

84. Defendants could have employed broader causation language in the Virus Exclusion and thereby excluded Plaintiff's losses due to the pandemic. It does use such language elsewhere in the Policy, but not in the Virus Exclusion.

85. For example, the Exclusion provision in the Businessowners Causes of Loss – Special Form states:

> We will not pay for loss or damage caused directly *or indirectly* by any of the following. Such loss or damage is excluded *regardless of any other cause or event that contributes concurrently or in any sequence to the loss*.

Ex. A at 181 (emphasis added).

86. In the Virus Exclusion, however, Main Street elected to use the more restrictive causation language, "caused by or resulting from," rather than "caused directly or indirectly." Therefore, the Virus Exclusion does not apply if the virus causes the loss indirectly. Here, if the coronavirus

19

has any causal relationship to Plaintiff's losses, it is indirect in that the virus caused COVID-19, which led to the pandemic, which caused Plaintiff to close its premises.

87. Nor does the Virus Exclusion apply if there is any other cause or event that contributes concurrently or in any sequence to the loss, as other exclusions do. Here, the other cause – indeed, the primary cause – is the COVID-19 pandemic.

88. The following screenshots show the differences between these two types of exclusions:[38]

| Causes of Loss Exclusion | Virus Exclusion |
|---|---|
| 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. | B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease. |

"directly or indirectly"

"regardless of any other cause or event"

No mention of "indirectly" or other cause

It could not be clearer that the Virus Exclusion does not apply if a virus causes a loss indirectly or where there is another cause.

89. Furthermore, even if the Virus Exclusion were applicable to the losses of Plaintiff and Class members, under the principles of regulatory estoppel and general public policy, Defendants should be estopped from enforcing it.

90. Specifically, in 2006, two insurance industry trade groups, the ISO and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.

91. In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

---

[38] Ex. A at 181, 153.

92. In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies:

> While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the spector of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

93. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

94. This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded…

95. These representations made by the insurance industry were false.

96. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to such property."

97. Upon information and belief, the state insurance departments relied on the industry's and Defendants' representation in approving the Virus Exclusion for inclusion in standard comprehensive policies without a reduction in premiums to balance a reduction in coverage.

98. The assertions made by the insurance industry and Defendants to obtain regulatory approval of the Virus Exclusion were misrepresentations and for this reason, among other public

21

policy concerns, Defendants should be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

99. In securing approval for the adoption of the Virus Exclusion by misrepresenting to the state regulators that the Virus Exclusion would not change the scope of coverage, Defendants effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.

100. Under the doctrine of regulatory estoppel, the Court should not permit Defendants to benefit from this type of duplicitous conduct before the state regulators.

101. For the above reasons, Plaintiff is entitled to coverage under the above provisions of The Policy.

**E. Defendant's Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them and Its Denial of Plaintiff's Claim**

102. Defendant has taken no steps to cover its insureds for their COVID-related business losses. On its website, despite devoting a web page to "COVID-19 Updates" and saying, "COVID-19 Update: We're Here to Help" it makes clear that that help does not extend to honoring its coverage obligations:[39]

---

[39] https://www.msagroup.com/COVID19 (accessed 10/26/2020).

## COVID-19 Update: We're Here to Help

We are committed and prepared to serve our policyholders, independent agents, employees and communities during the global COVID-19 pandemic. Here is a summary of some of the steps we're taking to help. We'll continue evaluating and adjusting to make sure those counting on us have the protection and support they need as we navigate these uncertain times together.

**Premium Relief – Personal Auto Customers**

- Pending Insurance Department approvals, customers with a personal auto policy as of March 31 will receive a $50 relief payment per eligible vehicle from Main Street America (excludes New York customers).

- In New York, Main Street America will be providing a 15% premium relief credit for customers with a personal auto policy as of May 31 for the months of July, August and September. We'll provide a refund to any customer who has already paid their policy in full.

**Premium Relief – Business Customers**

- Main Street America's business customer relief fund will give policyholders as of March 31 a 20% premium credit for April and May on Business Owners and Contractors policies (excludes New Jersey and New York).

- In New Jersey, we will be providing Business Owners, Contractors, Commercial Auto and Commercial Umbrella customers a 20% premium credit for March, April, May and June.

- In New York, we will be providing Business Owners and Contractor customers as of May 31 a 20% premium credit for May and June.

**Payment Leniency**

- For states where the department of insurance has mandated actions, state-specific payment extension and cancellation options apply.

- Payment deferment does not represent a period of free coverage. Normal billing cycle procedures resume July 1, 2020 unless state orders are in effect mandating certain payment extension periods. Deferred balances due will be spread over the remaining policy term.

- Contact your independent insurance agent for information regarding payment and billing suspension options in your state.

**Coverage Extensions**

- We are temporarily offering our restaurant customers hired and non-owned auto coverage for food delivery during the COVID-19 emergency period.

**Community Support**

- Our relief efforts also extend to individuals, families and businesses in communities where we operate. Through our NGM Charitable Foundation and Employee Matching Gift program, we are providing funds to support relief efforts for those facing financial uncertainty and other needs. Our efforts support those of the American Family Insurance group of companies, who have pledged $4 million in support of pandemic relief and other nonprofit efforts.

If you have been financially impacted by the coronavirus (COVID-19), and have additional questions about late payments, fees, cancellations, non-renewals or other payment concerns, we encourage you to discuss your options with your independent insurance agent.

103. Nowhere on this page does Main Street acknowledge to its customers that their COVID-19 losses are covered by its Policy.

104. Similarly, American Family has a "Coronavirus Update" page that conspicuously avoids telling policyholders that it will honor claims for business losses due to COVID-19[40]:



105. Despite that strategy, Plaintiff, through counsel, made a claim on its policy by email to Main Street's agent on September 24, 2020, and asked that Main Street acknowledge coverage and respond by October 1, 2020. Ex. B. In response, Main Street attempted to make it difficult for Plaintiff to pursue this claim.

106. Plaintiff received an emailed response on September 30, 2020, from Cassandra White, who identified herself as Claim Representative of Main Street America Insurance. Ex. C. On LinkedIn.com, she identifies her employer as The Main Street America Group.[41]

107. In that response, Ms. White demanded that Plaintiff complete a detailed seven-page questionnaire with 18 questions. Ex. D. Many of those questions asked for information that Main Street already knew or that was irrelevant to whether there was coverage for Plaintiff's business losses. For example, Question 3 asked for all addresses where Plaintiff operates without limiting them to those that are covered by the Policy. And, of course, it knows the addresses of the

---

[40] https://www.amfam.com/about/coronavirus (accessed 10/26/2020).
[41] https://www.linkedin.com/in/cassandra-white-562347108/ (accessed 10/26/2020).

covered locations from its underwriting procedures. It also asked how long Plaintiff had operated at each location, a question irrelevant to whether there is coverage.

108. Other questions asked Plaintiff to breach the medical confidentiality of its employees and others by asking the names of employees and employees' contacts who had contracted COVID-19. (Ex. D, Questions 13-15.)

109. The questionnaire also demanded information regarding the amount of the loss, which would only be relevant if Main Street acknowledged coverage. Ex. D, Question 17.

110. In response, Plaintiff's counsel emailed Ms. White that day and, after explaining why many of the questions were irrelevant to the determination of coverage, stated that "if there is information that you actually need to determine whether there is coverage, please let me know and explain how that information bears on the determination by pointing to the relevant provision of the policy." Counsel added, "[P]lease be specific. If, for example, you re-ask Questions 3 and 7, please explain how long the company needs to have been in business or needs to have operated at any particular location prior to the date of the policy (you know it was in business on the date of the policy) for you to accept coverage."

111. In response, Brian J. Brennan, identified as The Main Street America Insurance Corporate Litigation Manager, emailed Plaintiff's counsel. Like Ms. White, on his LinkedIn page, he identifies himself as employed at The Main Street America Group.[42] In his email, he stated: "Please provide as much of the requested information as you are comfortable providing. Upon receipt and review of same, if we are in need of additional, specific information we will reach out to you to discuss. Otherwise, we will evaluate the claim for coverage based on the information available to us." Ex. E (email of 10/1/2020 10:04 a.m.)

---

[42] https://www.linkedin.com/in/brian-brennan-28668237/ (accessed 10/26/2020).

112. A few hours later and before Plaintiff's counsel had an opportunity to respond, Ms. White emailed Plaintiff's counsel a "reservation of rights" letter under the letterhead, "The Main Street America Group." Ex. F. Despite Mr. Brennan's statement that Plaintiff should just provide the requested information it was "comfortable providing," this letter attached the entire Questionnaire and, even demanded additional information, such as "financial statements, payroll records and operating cost records for five years before you started to incur the claimed losses, and any other documents you believe substantiate the amount of loss claimed by you." Ex. F 13. As that statement indicates, such information would only be relevant if Main Street had decided there was coverage and was attempting to determine the amount of loss. Yet Main Street had not acknowledged coverage. Thus, by demanding that information, Main Street was simply harassing Plaintiff.

113. Plaintiff's counsel emailed Mr. Brennan later that afternoon and asked if Ms. White's re-submission of the questionnaire with a request for even more information meant that he didn't mean what he said earlier about merely providing information Plaintiff was comfortable with. Counsel also pointed out that what information he was "comfortable" providing was not the issue. "You know what information you need to make your decision and what information you have included in the questionnaire for some other reason. You should limit your questions to the former." Ex. E. He added: "Questions or requests for information related solely to the amount of the loss are not relevant until Main Street has agreed that there is coverage. Once Main Street has accepted coverage, I will be happy to quantify and substantiate the amount of the loss to the extent that is possible at this time." *Id.* (email of 10/1/2020 2:01 p.m.)

114. Mr. Brennan responded by saying, once again, that counsel should "provide as much of the requested information as you are comfortable providing." *Id.* (email of 10/1/2020 1:15 p.m.).

115. Plaintiff's counsel responded: "[A]lthough it is clear that you can't possibly need some of the information you asked for to determine whether you will accept coverage, I am not going to speculate on what you need and what you requested for some other reason.  Please clarify as I have now requested three times." *Id.* (email of 10/1/2020 2:31 p.m.)

116. Mr. Brennan responded curtly, "Please review to my email 10-1-2020 1:15 OM as to the company position on this matter." *Id.* (email of 10/1/2020 1:34 p.m.)

117. Plaintiff's counsel responded: "I take it that you are declining to clarify your questions and requests as I have asked." *Id.* (email of 10/1/2020 2:37 p.m.)

118. Mr. Brennan responded by, in an almost-word-for-word fashion, repeating his statement that Counsel should provide "as much of the information as you are comfortable providing." *Id.* (email of 10/1/2020 2:14 p.m.)

119. This time Plaintiff's counsel replied, "I don't see the point of going around in circles like this. Three times I told you that I wasn't going to speculate on what information you needed and have asked you to clarify your questions and requests. Three times you failed to say that you would do so. I know a 'no' when I see it." *Id.* (email of 10/1/2020 2:32 p.m.)

120. Within minutes, Plaintiff's counsel received an email from Mr. Brennan stating that Main Street had retained her in this matter and asking that all future communications be directed to counsel. Ex. E (email of 10/1/2020 2:46 p.m.).

121. On October 6, 2020, Defendants finally responded to the substance of the claim by denying coverage in a letter by Defendants' outside counsel. Ex. G. That letter states that it was responding to a claim "for losses related to COVID-19" or, quoting Plaintiff's claim, "for losses sustained in connection with the interruption of their business related to the COVID-19 pandemic." *Id.* at 1.

122. The letter began by complaining that Plaintiff had not provided information in response to Defendants' Questionnaire, without acknowledging that they had repeatedly refused to limit the questions to those that were relevant to their determination of coverage rather than attempting to burden Plaintiff with going to the time and effort of answering irrelevant questions.

123. The letter even spent three paragraphs complaining that Plaintiff had "not stated the amount of the loss or how the loss was calculated." *Id.* at 2. Yet the letter didn't explain why they would need to know the *amount* of the claim to determine whether there was coverage at all.

124. The letter went on to deny coverage for lost Business Income and Extra Expense on the purported ground that there was no "physical loss or damage to the property." *Id.* at 11. But as shown above, the policy covers "loss of" property, which occurs when an insured cannot use its property because of a pandemic. And Defendants also failed to acknowledge that the Policy covers non-direct, non-physical damage to property, as shown above.

125. Defendants also denied coverage under the Civil Authority provision on the ground that *Plaintiff* hadn't identified a Civil Authority order that triggered coverage. *Id.* at 11-12. Yet those orders are all public and publicly available to anyone who does a modicum of investigation. Defendants' denial letter identified no Civil Authority orders. Obviously, Defendants did no investigation.

126. Defendants also claimed that the virus exclusion barred coverage but in so doing betrayed a lack of understanding of the difference between the virus that causes the COVID-19 disease and the disease itself. The letter refers to "the SARS-CoV-2 virus more commonly known as COVID-19." *Id.* at 12. As even the barest investigation would have told them, COVID-19 is not

a virus. It is an illness or disease caused by a virus, as the United States Food & Drug Administration states on its website:[43]



127. The World Health Organization states that, contrary to the denial letter, SARS-CoV-2 is not more commonly known as COVID-19; instead, it is "the virus that causes COVID-19."[44]



---

[43] https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions (accessed 10/15/2020).
[44] https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (accessed 10/15/2020.

128. WHO made this simple concept even easier to understand on another webpage entitled, "Naming the coronavirus disease (COVID-19) and the virus that causes it":[45]



129. And, in case anyone still couldn't understand, WHO explained *why* the virus and the disease have different names. That explanation is, in part[46]:



---

[45] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (accessed 10/15/2020).
[46] *Id.*

130. In rejecting Plaintiff's claim under the Virus Exclusion, Defendants were under the misapprehension – presumably caused by the lack of an adequate investigation – that COVID-19 is a virus and therefore that Plaintiff's claim for losses caused by COVID-19 was a claim for losses directly caused by a virus without any other cause. But, in fact, a claim for losses caused by COVID-19 is a claim for losses caused by a pandemic of a disease, and, at best, only indirectly by a virus.

## V.  JURY DEMAND

131. Plaintiff demands a trial by jury on all claims so triable.

## COUNT I: BUSINESS INCOME BREACH OF CONTRACT

132. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

133. The Policy issued by Defendant to Plaintiff is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

134. In The Policy, Defendant expressly agrees to pay for losses of Business Income incurred as a result of causes not excluded under The Policy, including losses caused by the COVID-19 pandemic. Specifically, Defendant promises to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

135. A covered loss has resulted in business suspensions, which have caused Plaintiff lost Business Income and Extended Business Income.

136. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policy.

137. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

138. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses. Accordingly, Defendant is in breach of The Policy.

139. Due to Defendant's breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME

140. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

141. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff in the following respects:

   a. Unreasonably acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

   b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

   c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

   d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

   e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

   f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

   g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

32

> h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;
>
> i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;
>
> j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;
>
> k. Unreasonably placing its own financial interests above the interests of Plaintiff; and
>
> l. Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

142. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing.

143. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

**COUNT III: DECLARATORY RELIEF IN CONNECTION WITH BUSINESS INCOME**

144. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

145. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

146. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay its losses for claims covered by The Policy.

147. In The Policy, Defendant expressly agrees to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promised to pay for losses of business income and extended business income sustained as a result of a business suspension.

148. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

149. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policy.

150. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

151. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

152. Plaintiff seeks a judicial determination of whether The Policy provides coverage for Plaintiff's losses.

153. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of The Policy.

## COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT

154. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

155. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

156. In The Policy, Defendant expressly agrees to pay for extra expenses incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's premises, to repair or replace any property, and other expenses.

157. A covered loss has resulted in business suspensions. These suspensions have caused Plaintiff to incur extra expenses.

158. The extra expenses triggered the Extra Expense Coverage under The Policy

159. Plaintiff has complied with all applicable provisions of its Policy, including payment of premiums.

160. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

161. Due to Defendant' breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

### COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN CONNECTION WITH EXTRA EXPENSE COVERAGE

162. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

163. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff with respect to the Extra Expense provisions in the following respects:

    a.   Unreasonably acting or failing to act in a manner that deprives Plaintiff the benefits of its Policy;

    b.   Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    c.   Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

    d.   Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

    e.   Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    f.   Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    g.   Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;

j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

k. Unreasonably placing its own financial interests above the interests of Plaintiff; and

l. Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

164. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of The Policy.

165. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

**COUNT VI: DECLARATORY RELIEF IN CONNECTION WITH EXTRA EXPENSE COVERAGE**

166. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

167. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

168. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's claims covered by The Policy.

169. In The Policy, Defendant expressly agrees to pay extra expenses incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's premises, to repair or replace any property, and other expenses.

170. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

171. These covered losses have resulted, and will result, in extra expenses, which has caused Plaintiff's losses.

172. The extra expenses triggered the Extra Expense Coverage under The Policy.

173. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

174. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

175. Plaintiff seeks a judicial determination of whether the Extra Expense provisions of The Policy provides coverage for Plaintiff's losses.

176. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of the Extra Expense provisions of Plaintiff's Policy.

## COUNT VII: CIVIL AUTHORITY BREACH OF CONTRACT

177. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

178. The Policy issued by Defendant to Plaintiff is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

179. In The Policy, Defendant expressly agrees to pay for losses caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

180. Plaintiff has sustained such losses as set forth above.

181. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

182. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses. Accordingly, Defendant is in breach of The Policy.

183. Due to Defendant's breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

**COUNT VIII: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO CIVIL AUTHORITY COVERAGE**

184. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

185. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff in the following respects in connection with the Policy's Civil Authority coverage:

    a.   Unreasonably acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    b.   Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    c.   Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

    d.   Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

    e.   Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    f.   Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    g.   Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;

j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

k.  Unreasonably placing its own financial interests above the interests of Plaintiff; and

l.  Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

186. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing.

187. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

**COUNT IX: DECLARATORY RELIEF IN CONNECTION WITH CIVIL AUTHORITY COVERAGE**

188. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

189. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

190. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay its losses for claims covered by The Policy.

191. In The Policy, Defendant expressly agrees to pay for loss under the Civil Authority provision. Specifically, Defendant promises to pay for losses caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to

property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

192. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

193. The business suspensions and losses triggered the Civil Authority coverage under The Policy.

194. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

195. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

196. Plaintiff seeks a judicial determination of whether The Policy provides coverage for Plaintiff's losses.

197. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of The Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant, as follows:

1. A judicial declaration declaring the meaning of the provisions of The Policy concerning the business income coverage and extra expense coverage;

2. An award of damages to Plaintiff in an amount to be determined at trial;

3. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

4. An award of costs as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: October 27, 2020                    Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD, LLC**
By:   */s/ Richard S. Cornfeld*
    Richard S. Cornfeld, #31046MO
    Daniel S. Levy, #66039MO
    1010 Market Street, Suite 1645
    St. Louis, Missouri 63101
    P. 314-241-5799
    F. 314-241-5788
    rcornfeld@cornfeldlegal.com
    dlevy@cornfeldlegal.com

    And

    Anthony S. Bruning, #30906MO
    Anthony S. Bruning, Jr., #60200MO
    Ryan L. Bruning, #62773MO
    THE BRUNING LAW FIRM, LLC
    555 Washington Avenue, Suite 600
    St. Louis, Missouri 63101
    P. 314-735-8100 / F. 314-898-3078
    tony@bruninglegal.com
    aj@bruninglegal.com
    ryan@bruninglegal.com

    And

    Alfredo Torrijos (*Pro Hac Vice*)
    ARIAS SANGUINETTI WANG & TORRIJOS, LLP
    6701 Center Drive West, 14th Floor
    Los Angeles, CA
    T: (310) 844-9696
    F: (310) 861-0168
    alfredo@aswtlawyers.com

    And

    Mark C. Goldenberg, #0990221
    Thomas P. Rosenfeld #06301406
    Kevin P. Green #06299905
    GOLDENBERG HELLER
    2227 South State Route 157
    Edwardsville, IL 62025
    618-656-5150
    mark@ghalaw.com
    tom@ghalaw.com
    kevin@ghalaw.com

*Attorneys for Plaintiff*